## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MIGUEL RICO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.  3:20-cv-00415-GCS** |
| | ) | |
| **DANIEL SULLIVAN,** | ) | |
| **LOUIS BROWDER, and** | ) | |
| **SHANE SMITH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### <u>MEMORANDUM & ORDER</u>

**SISON, Magistrate Judge:**

#### INTRODUCTION AND BACKGROUND

Pending before the Court is a motion for summary judgment filed by Defendants Browder, Smith, and Sullivan. (Doc. 121, 131). Plaintiff, by and through court appointed counsel, opposes the motion. (Doc. 127, 128, 129, 130). Based on the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** the motion.

Plaintiff Miguel Rico is a prisoner currently incarcerated at Pontiac Correctional Center ("Pontiac") in the Illinois Department of Corrections ("IDOC"). He filed this lawsuit pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while he was confined at Big Muddy River Correctional Center ("Big Muddy"). (Doc. 1). His claims include violations of the Prison Rape Elimination Act ("PREA"), retaliation, and cruel and unusual punishment. He seeks monetary damages.

Plaintiff alleges that on June 22, 2018, he was using the toilet in his cell with the door closed; he had also covered the screen opening in the door. (Doc. 1, p. 11). Defendant C/O Shane Smith opened the cell door, made an insulting comment about Plaintiff's genitals, and left the cell door open to the dayroom area while Plaintiff was still sitting on the toilet. Defendant Smith ignored Plaintiff's request that he shut the door. That evening, Defendant Smith issued Plaintiff a disciplinary report for covering the screen in his door. *Id.* at p. 12, 26-28.

The next day, Plaintiff called the PREA hotline to file a sexual misconduct complaint against Defendant Smith for the above actions. (Doc. 1, p. 12, 35-36). John Doe #1 (Internal Affairs Lieutenant) interviewed Plaintiff about the incident and indicated he would keep Plaintiff separate from Defendant Smith. *Id.* at p. 12.

During July and August 2018, Defendant Smith retaliated against Plaintiff for making the PREA complaint by denying Plaintiff access to the dayroom, yard, and gym; making sexual comments about what he had done to Plaintiff's lunch trays;[1] causing Plaintiff to refuse the trays; kicking Plaintiff's cell door to wake him; and denying him lunch trays. (Doc. 1, p. 12-13).

During July and August 2018, Defendant Lt. Browder joined in the retaliation by sending Plaintiff to segregation on a false claim, refusing to give Plaintiff his lunch trays,

---

[1]     Plaintiff's exhibits indicate that Defendant Smith told Plaintiff he had contaminated the lunch tray with semen. (Doc. 1, p. 12-13).

and making sexual comments about what he had done to Plaintiff's lunch trays. (Doc. 1, p. 13, 31, 45-46).[2]

On July 27, 2018, Plaintiff was on suicide watch in the Receiving Unit and was being supervised by Defendant Smith. An inmate worker slid a razor blade through the chuckhole into Plaintiff's cell and told him to kill himself. Defendant Smith "was nowhere to be seen" at the time. Plaintiff later used the razor blade to cut his forearm and wrist. (Doc. 1, p. 14). There were no restrictions to prevent other inmates from having access to the suicide watch cells in the Receiving Unit. *Id.* at p. 14-15.

On July 29, 2018, Defendant Internal Affairs Officer Derek S. Smith wrote Plaintiff a disciplinary report for having dangerous contraband (the razor blade) while on suicide watch. Defendant Browder and Valdez found Plaintiff guilty and imposed punishment, which included segregation, commissary restriction, and a disciplinary transfer. These Defendants apparently did not follow the procedure required for seriously mentally ill ("SMI") inmates under the agreement in *Rasho v. Baldwin*, (C.D. Ill. Case No. 07-cv-1298). (Doc. 1, p. 15, 51-53). Defendant Warden Sullivan affirmed the disciplinary action, and Administrative Review Board Member Knauer denied Plaintiff's grievance.[3] *Id.* at p. 15-16.

---

[2]    Per Plaintiff, Defendant Browder claimed to have contaminated Plaintiff's trays with semen or saliva; Plaintiff rejected his lunch trays based on Defendant Smith's and/or Defendant Browder's actions on approximately 10 occasions. (Doc. 1, p. 45-46).

[3]    The Complaint states that the disciplinary report was issued July 19, 2018, however, the attached copy of the report shows it was issued on July 29, 2018. (Doc. 1, p. 51-52).

On August 27, 2018, Plaintiff was showering when Defendant Smith walked by and made insulting racial comments about Plaintiff's genitals to other officers who were nearby. (Doc. 1, p. 16).

During July and August 2018, Plaintiff wrote several emergency grievances and requests to Defendant Knauer, Defendant Sullivan, and John Doe #1 (Internal Affairs Lt.), reporting the incidents of retaliation. (Doc. 1, p. 16). However, they did nothing to protect Plaintiff from further retaliation or sexual misconduct. *Id.* at p. 18.

On September 1, 2021, the Court conducted a preliminary review of the complaint pursuant to 28 U.S.C. § 1915A and allowed Plaintiff to proceed on the following claims:

> Count 1:     First Amendment retaliation claims against Defendants Shane Smith, James Bruce, Louis Browder, and Brad Garren for taking adverse actions against Plaintiff after Plaintiff brought a PREA complaint against Smith.

> Count 2:     Eighth Amendment cruel and unusual punishment claims against Defendants Smith and Browder for sexually harassing and taking retaliatory actions against Plaintiff.

> Count 6:     Eighth Amendment claims against Defendants Daniel Sullivan, Browder, Debbie Knauer, and Michael Clark for failing to protect Plaintiff from Shane Smith's ongoing sexual harassment and retaliation.

> Count 7:     Eighth Amendment claims against Defendants Sullivan and Smith, for failing to protect Plaintiff while he was on suicide watch from the inmate who placed a razor blade in his cell.

(Doc. 12).[4]

---

[4]     On September 1, 2021, the Court substituted Defendant Michael O. Clark for John Doe # 1 and Brad A. Garren for John Doe # 2. (Doc. 59).

On February 14, 2022, the Court granted Defendants' motion for summary judgment on the issue of exhaustion of administrative remedies. (Doc. 74). The Court dismissed without prejudice Plaintiff's claims against Defendants Brad Garren and James Bruce in Count 1; claims against Defendants Sullivan, Browder, Knauer, and Clark in Count 6; and the claims against Defendant Smith in Count 7. *Id.* Remaining in the case were claims against Defendants Smith and Browder in Count 1; claims against Defendants Smith and Browder in Count 2; and the claim against Defendant Sullivan in Count 7. *Id*.

## FACTS

The following facts are taken from the record and presented in the light most favorable to Plaintiff, the non-moving party, and all reasonable inferences are drawn in his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

Plaintiff is an inmate within the IDOC housed at Pontiac. The allegations in Plaintiff's complaint took place while he was incarcerated at Big Muddy.

Plaintiff alleges that Defendant Sullivan failed to protect him while he was on suicide watch from another inmate who slid a razor blade into his cell. At the time, July 27, 2018, Plaintiff was on a 10-minute crisis watch in receiving.

According to Plaintiff, Defendant Sullivan, as the warden, was responsible for ensuring the safety and security of inmates and those inmates on crisis watch. Defendant Sullivan's authority in his supervisory position as warden is relevant to Plaintiff's claim

against him. Plaintiff does not know the extent of Defendant Sullivan's authority.

Plaintiff does not know if Defendant Smith knew Plaintiff had a razor blade.

Big Muddy's policy is to keep individuals away from the crisis cells in receiving. There is a yellow painted line in front of the cell's doorway. The wing officer is to keep everyone out from behind that line. Individuals are to stay away from the crisis cells.

One officer was assigned to receiving. Defendants used duct tape to keep other individuals from the crisis cells. At the relevant time, Defendant Smith was nowhere to be seen on his assigned wing. Individuals on crisis watch were limited to materials approved by mental health.

According to the Investigational Interview Reports prepared by Internal Affairs Officer Clark, at the time of the toilet incident, June 22, 2018, Plaintiff was assigned to Receiving Cell No. 16. Plaintiff does not know why Defendant Smith initially opened his cell door, which resulted in Defendant Smith taking down Plaintiff's window covering on June 22, 2018. However, Plaintiff was aware, in 2018 at Big Muddy, that it was against the rules to impede surveillance in the cells. On June 22, 2018, Defendant Smith issued Plaintiff a disciplinary ticket for impeding surveillance.

On June 23, 2018, Plaintiff used the PREA Hotline to report the toilet incident.

On June 26, 2018, Big Muddy was notified and asked to investigate after Plaintiff had submitted a PREA complaint. That same day, Internal Affairs interviewed Plaintiff and granted Plaintiff's request to see mental health. Internal Affairs did not review

Plaintiff's vulnerable status or Defendant's predator status during the PREA investigation. The prior and current status of both parties was not classified. Defendant Smith was not interviewed in connection with the PREA investigation until August 14, 2018. Internal Affairs concluded the PREA investigation on August 16, 2018. Big Muddy's PREA Checklist confirms that Defendant Sullivan was notified about Plaintiff's PREA complaint.

On June 28, 2018, Plaintiff was brought before the Adjustment Committee regarding the disciplinary ticket Defendant Smith issued him on June 22, 2018. Defendant Sullivan signed off on the Adjustment Committee's decision on June 29, 2018. By July 5, 2018, Plaintiff had been found guilty of the disciplinary ticket issued by Defendant Smith on June 22, 2018.

On July 6, 2018, Plaintiff filed a grievance complaining that despite Internal Affairs Lieutenant Clark assuring him that Defendant Smith would be kept away from him, Defendant Smith approached Plaintiff in the Receiving Wing on July 3, 2018, and said: "I know you call PREA on me you little Bitch." That same day, Plaintiff wrote another grievance complaining that Defendant Smith was assigned to Receiving Wing on July 4, 2018, and denied Plaintiff access to the dayroom stating: "[y]ou not coming out . . . you wanna call PREA on me you little Bitch." And again, on July 6, 2018, Plaintiff filed another grievance complaining that Defendant Smith was assigned to the Receiving Wing and denied Plaintiff access to gym and/or dayroom time.

On July 12, 2018, Plaintiff filed a grievance regarding retaliation for filing the PREA complaint. In the grievance, Plaintiff recounted officers attempting to move him out of the Receiving wing so that Defendant Smith could get his assigned wing back. Defendant Smith was reassigned to another wing away from Plaintiff because Plaintiff had filed a PREA complaint about him. Plaintiff also complained that Defendant Browder cuffed him, walked him to segregation, and placed him in the shower holding cage to be stripped searched by Defendant Smith.

On July 16, 2018, Plaintiff was moved from segregation 1 gallery, cell 15 to receiving 1 gallery cell 12, then to healthcare 1 gallery, cell 3, then back to receiving 1 gallery, cell 12.

On July 16, 2018, Plaintiff was on a continuing crisis watch during part of that day and on a 15-minute watch for the other part of the day. On July 17, 2017, Plaintiff was on a 15-minute watch. On July 20, 2018, Plaintiff's crisis watch increased from a 15-minute crisis watch to a 10-minute crisis watch.

On July 27, 2018, Mental Health completed a Special/Residential Treatment Unit Referral for Plaintiff. The referral noted that Plaintiff was refusing meals from the officers on the day shift but accepting meals from the officers on the other shifts. Also, included in the referral was Plaintiff's past treatment history. This history included reports that Plaintiff was not suicidal, and if security would have allowed him to declare a hunger strike, he would not have said he was suicidal. The history also indicated that Plaintiff

was denied protective custody from gangs with who he was no longer associated, so Plaintiff claimed to be suicidal because he was going to be released from segregation. The history also noted that Plaintiff declared a hunger strike to be transferred to another facility.

On July 29, 2018, Plaintiff requested to speak to the head of Mental Health. He was told she would be in the following day. Plaintiff also refused to speak with the Mental Health professional who came to see him that day.

On July 30, 2018, Plaintiff's Mental Health records reflect the following:

Rico alleged he was being retaliated against for making a report against staff member. He stated the only place he feels "safe" is on crisis watch. He had been housed in Receiving and an enemy is also placed in Receiving. He is the person who gave Rico the razor. Mr. Rico denied having suicidal ideation or plans to commit suicide.
. . .
He reported he has heard voices during crisis watch telling him not to speak to Mental Health staff.
. . .
Mr. Rico stated he is depressed because he feels hopeless. Mr. Rico wants to be isolated so he feels safe. If he was isolated he would not feel depressed per self-report.

. . . Ms. Couch stated she would advocate with Warden Sullivan to have him single celled in segregation, but the final decision was up to the Warden.
. . .
There were no symptoms of paranoia or delusional disorder.
. . .
Mr. Rico stated he has enemies at this facility and he does not feel safe being in general population. He wants to remain in segregation. When the incident with the razor and superficially cutting himself occurred, Rico stated one of his enemies in Receiving slipped him the razor. He stated he only felt hopeless and depressed when housed around enemies.
. . .

He admitted his conduct and presentation was for the benefit of remaining on
a crisis watch where he felt safe.

(Doc. 127-2, p. 100-101).

The next day, Plaintiff met with Mental Health while he was on 15-minute crisis

watch; he requested a single cell in segregation. Plaintiff also reported that "he doesn't

feel that others are doing anything to rectify the situation that he is reporting to staff."

(Doc. 127-2, p. 102). He also stated he has "difficulty with staff and feels he has been

retaliated against for making staff accountable for their actions." *Id*. Additionally, the

progress notes states that he "does not present with auditory or visual hallucinations as

evident by him not responding to internal stimuli." *Id*. at p. 103.

On August 1, 2018, Plaintiff saw Mental Health and was released from crisis care.

Specifically, the progress note reads:

> Rico is released from crisis care at 1:10 p.m. He denied having suicidal
> ideation. Rico reported he has enemies at this facility. He used crisis watch to
> be removed from general population because he reported being fearful that
> someone would harm him. Today he was apprehensive and worried about
> being removed from crisis watch. This facility does not have protective
> custody available for offenders. Ms. Couch, Psych Administrator, advocated
> for him to be singled cell when he returned to segregation, but he was advised
> security will make that decision regarding placement. She spoke to the warden
> to discuss concerns with him. MHP and Mr. Rico talked to Dr. Lifchitz,
> Psychiatrist by video, and he was in agreement to discontinue crisis watch. He
> will be seen per crisis watch follow-up protocol. Since he was released from
> crisis watch, he does not meet criteria to be designated as SMI.

(Doc. 127-2, p. 107).

Plaintiff's daily Mental Health progress notes indicate that Plaintiff's refusal of

mental health treatment was witnessed by security staff.

On August 1, 2018, Plaintiff filed a grievance complaining that from July 17, 2018 to August 1, 2018, Plaintiff refused his lunch trays because Defendants Smith and Browder told Plaintiff that his lunch trays were contaminated with "semen ranch."

Plaintiff alleges that Defendant Smith was kicking Plaintiff's cell door when Defendant Smith did not kick anyone else's door during August 2018. Defendant Smith was kicking Plaintiff's door while performing a head count.

When performing head counts, the officer must be able to see the individual. If a person is under the covers, the officer first speaks to the individual. If there is no response, then additional steps are taken. The officer hits the door, turns on the lights, and then the officer enters the cell.

The food supervisor was not a correctional officer. Inmates, who work under the direction and supervision of correctional officers, assisted in delivering lunch trays. A new food tray may be requested, and such requests are made all the time.

If an individual refuses housing from general population and there are no cells available in the receiving unit until appropriate housing could be located, then the only recourse is to be placed in restrictive housing under temporary confinement. If an individual is in receiving and is assigned back to general population, and if there is no room in receiving, then a disciplinary ticket is written, and the individual is sent to restrictive housing.

An individual may ask his or her counselor for a grievance form. Individuals place

their grievance in a locked box where an officer cannot see the grievance.

For individuals who are not under a mental health hold or disciplinary status, their cells are placed on access which means they could exit their cells by merely pushing a button or using their keys. An officer has no authority to deny an individual access to day room if there are no restrictions on the individual. If there are cell restrictions, those restrictions are placed by mental health.

Plaintiff noticed that he lost weight but does not know how much as he did not weigh himself. Plaintiff was not allowed to buy food from the commissary because he was on suicide watch.

Plaintiff's damages are for weight loss and for emotional harm.

### SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing FED. R. CIV. PROC. 56(a)). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the

light most favorable to, and draws all reasonable inferences in favor of, the non-moving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, and as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

DISCUSSION

A.    **First Amendment Retaliation Claim (Count 1)**

Defendants argue that Plaintiff's claims of denying him access to out-of-cell activities, contaminating his lunch trays, denying him food, and issuing false/wrong disciplinary tickets, would not deter a person of "ordinary firmness" from engaging in protected activity. Plaintiff counters that there is substantial evidence of retaliation against Plaintiff after he filed the PREA complaint. Based on the record, the Court concludes that genuine issues of material fact exist which preclude summary judgment on this claim.

To prevail on a First Amendment retaliation claim, Plaintiff must show that (1) he engaged in protected First Amendment activity; (2) an adverse action was taken against him; and (3) the protected conduct was at least a motivating factor of the adverse action. *See Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020). If the plaintiff establishes these

elements, the burden shifts to the defendants to show that the adverse action would have occurred even in the absence of the protected conduct. *See Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013); *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011). Once the defendant produces evidence that the same decision would have been made in the absence of the protected conduct, the burden shifts to back to plaintiff to demonstrate the defendant's proffered reason was pretextual and the real reason was retaliatory animus, *i.e.*, the defendant's reason is a lie. *See Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012). Lodging a complaint for a prison official's violation of the Prison Rape Elimination Act is protected activity under the First Amendment. *See Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009).

The plaintiff must show that the injury or adverse action against him would deter a person of ordinary resolve from exercising his or her right to free speech. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). Harassment or other retaliatory actions which are unlikely to deter a person of ordinary firmness from exercising his or her right to free speech are not actionable. *Id*. To state a claim for retaliation, a plaintiff's complaint must set forth a "chronology of events from which retaliation may plausibly be inferred." *Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000) (quoting *Cain v. Lane*, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988)).

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has presented a timeline of events from which a retaliation claim can be inferred.

Defendants' alleged actions, when viewed together, may deter a person of reasonable
firmness in the prison setting from engaging in future protected activity. In fact, a jury
may reasonably determine that Defendants' alleged comments and actions taken against
Plaintiff after he filed the PREA complaint through August 2018 are sufficient to sustain
a retaliation claim. As argued by Defendants, when viewed separately, the alleged
comments and alleged conduct might not rise to a constitutional violation individually,
but when viewed together, the alleged comments and alleged conduct plausibly
demonstrate an alleged pattern of repeated retaliation against Plaintiff that occurred after
he filed the PREA complaint against Defendant Smith. Thus, there are questions of
material fact that preclude summary judgment.

**B.    Eighth Amendment Cruel and Unusual Punishment Claim (Count 2)**

In this Count, Plaintiff was allowed to proceed against Defendant Smith for his
conduct on June 22, 2018, of leaving Plaintiff's cell door open to a public area while he
was on the toilet, which exposed Plaintiff to the view of other inmates. The count also
includes Defendant Smith's mocking of Plaintiff when he showered on August 27, 2018,
and his sexual comments indicating he had contaminated Plaintiff's lunch trays. Further,
Plaintiff was allowed to proceed against Defendant Browder for similar sexual
harassment regarding the lunch trays. Plaintiff argues that Defendants Smith and
Browder are liable for their verbal harassment as they had unfettered access to him and
knowledge of Plaintiff's status while he was on crisis watch. Based on the circumstances

and the pertinent case law, the Court finds that there are questions of genuine issues of material fact that preclude summary judgment on this count as well.

"The Eighth Amendment prohibits cruel and unusual punishments that involve the unnecessary and wanton infliction of pain." *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019). This includes "acts 'totally without penological justification.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 737 (2002)). "Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest, or deny a prisoner equal protection of the laws." *Dewalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000), abrogated on other grounds by *Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020). And whether "[s]imple or complex, most verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment." *Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015).

However, verbal harassment can rise to that level depending on the context. Cases from the Seventh Circuit demonstrate that, where the verbal harassment inflicts either physical or psychological pain, takes advantage of a vulnerability, is "not fleeting" or not "too limited to have an impact" but instead is significant or reoccurring, and/or the official is "uniquely situated" to aggravate or cause pain to the prisoner, it can rise to the level of a constitutional violation. *See Beal*, 803 F.3d at 358-359; *Lisle*, 933 F.3d at 718-719. This list is not comprehensive, and depending upon the facts of a case, other situations may create unconstitutional conditions. *Id.*

The Seventh Circuit has stressed that, where the verbal harassment is "too limited to have an impact," it is not a constitutional violation. *Beal*, 803 F.3d at 358. In *Lisle*, the Seventh Circuit expanded on its analysis in *Beal,* explaining that the verbal comments must cause either extreme physical or psychological pain, usually in the context where a prison official exploits a known vulnerability with the sole purpose of exacting "psychological anguish," *Lisle*, 933 F.3d at 718-719. The Seventh Circuit has also acknowledged that comments that "labeled [a plaintiff] homosexual . . . increased the likelihood of sexual assaults on him by other inmates." *Beal*, 803 F.3d at 358; *Lisle*, 933 F.3d at 718.

The question here is whether Defendants' comments and actions rise to the level of Eighth Amendment violations. Taking the facts in the light most favorable to Plaintiff and using *Beal* as a guide, the Court finds that genuine issues of material fact exist that a reasonable jury must decide. Here, as stated *supra*, Plaintiff has presented a plausible chronology of events from June 2018 to August 2018 wherein Eighth Amendment harassment claims can be inferred against both Defendants. The Court agrees with Defendants that when viewed separately, the comments and conduct individually might not rise to a constitutional violation. However, when these comments and actions are considered together (as they must), along with the frequency of these actions from June through August, the Court finds that a reasonable jury may find a malicious animus and/or psychological punishing effect based on the totality of the circumstances. In fact,

Plaintiff's Mental Health notes reflect the impact of these events on Plaintiff. Thus, the Court finds that Defendants are not entitled to summary judgment as to this claim.

## C.    Eighth Amendment Failure to Protect Claim (Count 7)

Plaintiff claims that Defendant Sullivan failed to protect him while he was on suicide watch, and as a result, he was given a razor blade which he used to attempt suicide. Defendant Sullivan argues that he did not disregard Plaintiff's safety concerns as he did not have sufficient knowledge of the risk of harm to Plaintiff and that he lacks personal involvement. Plaintiff counters that there is a genuine dispute as to whether Defendant Sullivan had the authority to assign more officers to the Receiving Unit and that there is a genuine dispute as to whether Defendant Sullivan was aware there was an active PREA investigation regarding Plaintiff and Defendant Smith. Based on the circumstances, the Court finds that Defendant Sullivan is entitled to summary judgment on this claim.

Being suicidal is an objectively serious medical/mental health condition. *See Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). "Deliberate indifference to a risk of suicide is present when an official is subjectively 'aware of the significant likelihood that an inmate may immediately seek to take his own life' yet 'fail[s] to take reasonable steps to prevent the inmate from performing the act.'" *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775-776 (7th Cir. 2014) (quoting *Collins*, 462 F.3d at 761), abrogation on other grounds recognized by, *Pulera v. Sarzant*, 966 F.3d 540 (7th Cir. 2020).

Officers are liable under section 1983 only if they had "some personal involvement in the alleged constitutional deprivation." *See Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019); *see also Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023). A theory of respondeat superior does not suffice – a plaintiff must show that the defendant's own conduct violated the Constitution. *See Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (citation omitted). Deliberate indifference requires awareness about the problem. *See Love v. Illinois Dept. of Corrections*, Case No. 18-cv-06084, 2020 WL 1237200, at *6 (N.D. Ill. Mar. 13, 2020). For a supervisor to be liable for a subordinate's constitutional violation, the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Taylor v. Ways*, 999 F.3d 478, 494 (7th Cir. 2021) (citations omitted). A high-ranking officer "can be expected to know of or participate in creating systemic, as opposed to localized" constitutional violations. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996); *see also Smith v. Dart*, 803 F.3d 304, 310 (7th Cir. 2015).

Here, there is no evidence in the record that establishes that Defendant Sullivan's conducted violated Plaintiff's constitutional rights. Likewise, nothing in the record demonstrates that Defendant Sullivan created, approved, or condoned the policy that allowed an inmate access to Plaintiff while he was on crisis watch. Specifically, Defendant Sullivan testified:

> Q. Do you know if there were any policies to try to keep inmates from, for the lack of a better word, loitering –

A. Yes.

Q. – near the crisis cells?

A. Yes. I believe there was a yellow painted line around in front of the doorway of the cell. The wing officer was to keep everybody out from behind that, to talk to them: To stay away from the cell. But, ma'am, that is virtually impossible when you have got a hundred inmates to take care of and you're responsible for doing all of the duties on that wing.

Q. Do you recall how many officers were assigned to that wing?

A. One.

Q. Any particular reason why not to add another?

A. That is what the post called for. As a warden you could ask for more posts and put more people in certain spots, but unless Springfield approved that, you're not allowed to do that; your hands are tied.

. . .

Q. Could you decide how many officers were on duty at any one place at one time?

A. No. That was set forth by Springfield.

Q. And could you determine how crisis watch was handled on receiving?

A. No."

(Doc. 121-2, p. 5, 8).

Moreover, the record does not indicate that Defendant Sullivan had a sufficient causal connection or the requisite subjective knowledge of the specific risk to Plaintiff. Defendant Sullivan *may* have known that Plaintiff filed a PREA complaint against Defendant Smith. However, such knowledge does not mean that Defendant Sullivan was aware of a risk that an inmate might give Plaintiff a razor blade and that Plaintiff would use that razor. At the time the inmate slid a razor blade into Plaintiff's cell, Plaintiff was on a 10-minute crisis watch in Receiving as directed by Mental Health. Defendant Smith, who was assigned to the wing, was elsewhere in the Receiving Unit, and Plaintiff testified that he did not know if Defendant Smith was aware he had the razor blade. (Doc. 121-1,

p. 27). Thus, the Court finds that Defendant Sullivan is entitled to summary judgment on
this claim against him.

### D.    Qualified Immunity

Lastly, Defendants argue that they are entitled to summary judgment because
qualified immunity protects them from liability. "Qualified immunity attaches when an
official's conduct does not violate clearly established statutory or constitutional rights of
which a reasonable person would have known." *White v. Pauly*, 137 S.Ct. 548, 551 (2017).
The test for qualified immunity has two prongs: (1) whether the facts, taken in the light
most favorable to the party asserting the injury, demonstrate that the official's conduct
violated a constitutional right, and (2) whether the right at issue was clearly established
at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Plaintiff's First Amendment and Eighth Amendment rights were clearly
established at the time of Defendants' alleged misconduct. "[F]ederal courts have long
recognized a prisoner's right to seek administrative or judicial remedy of conditions of
confinement, as well as the right to be free from retaliation for exercising this right."
*Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996). Thus, Defendants Smith and Browder
are not entitled to summary judgment based on qualified immunity.

### CONCLUSION

Accordingly, the Court **GRANTS in part** and **DENIES in part** the motion for
summary judgment. (Doc. 121). The Court **DENIES** the motion as to Counts 1 and 2 and

**GRANTS** the motion as to Count 7. Thus, the Court **FINDS** in favor of Defendant Sullivan and against Plaintiff Rico in Count 7, the failure to protect claim. Further, the Court **DIRECTS** the Clerk of the Court to enter judgment reflecting the same at the close of the case. The matter is to proceed to trial on Counts 1 and 2 against Defendants Smith and Browder. Lastly, the Court **DIRECTS** the Clerk of the Court to set this matter for status conference to discuss the possibility of a settlement conference and/or potential trial dates.

       **IT IS SO ORDERED.**

       **DATED:  January 8, 2025.**

Gilbert C Sison

Digitally signed by Gilbert C Sison Date: 2025.01.08 16:58:28 -06'00'

**GILBERT C. SISON**
**United States Magistrate Judge**